CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED ~~For~~ RKu

AUG 0 1 2011

JULIA C. DUDLEY, CLERK
BY: HMcDonald
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

DAUGHTON W. LACEY, JR.,    )    Civil Action No. 7:10-cv-00139
    Plaintiff,    )
    )
v.    )    **MEMORANDUM OPINION**
    )
DANIEL BRAXTON, et al.,    )    By:  Hon. Jackson L. Kiser
    Defendants.    )    Senior United States District Judge

Daughton W. Lacey, Jr., a Virginia inmate proceeding pro se, filed a civil rights action, pursuant to 42 U.S.C. § 1983 with jurisdiction vested in 28 U.S.C. § 1343. Plaintiff names as defendants Daniel Braxton, Warden of the Augusta Correctional Center ("ACC"); Steve Hollar, Assistant Warden of the ACC; Tracy Lawhorn, an ACC Treatment Program Supervisor; Phyllis Byrd, the ACC Law Library Supervisor; ACC correctional officers Workman, Griffin, Sergeant Stickler, Lieutenant Canterbury, and Lieutenant Perry; John Jabe, Deputy Director of the Virginia Department of Corrections ("VDOC"); and John Garman, a VDOC Regional Director. Plaintiff alleges that the defendants violated his constitutional and statutory rights to the free exercise of religion, due process, and property. The defendants filed a motion for summary judgment, and plaintiff responded, making the matter ripe for disposition. After reviewing the record, I grant plaintiff's motion to file a supplemental response, deny plaintiff's motions to strike and for sanctions, and grant defendants' motion for summary judgment.

I.

A.    PLAINTIFF'S COMPLAINT

Plaintiff has been a sincere member of the religious group House of Yawheh ("Yawheh") for seventeen years. The Yahweh faith requires its members to use a Book of Yahweh to pray three times a day at morning, mid-day, and evening. Yahwists practice congregational service on

each Saturday, their Sabbath, and at seven feasts during the year.

While housed at the Brunswick Correctional Center ("BCC"), BCC officials allowed plaintiff to purchase and possess a Tallit prayer shawl; a Kippah Yarmulke; and a Book of Yahweh and to meet with other Yahwists to practice communal faith with these items each Sabbath. The VDOC closed the BCC and ordered plaintiff transferred to the ACC. BCC correctional officers packed plaintiff's belongings into six boxes before transferring him. Pursuant to VDOC policy, one of these boxes, called a "hot box," contained the items plaintiff told the officers he needed immediately upon his arrival at BCC. These items included a Bible, The Book of Yahweh, a cable-TV transformer, and three TV cables. Plaintiff wore a pair of sneakers during his transfer.

After plaintiff arrived at the ACC on September 30, 2009, all of his personal property boxes were confiscated to determine if anything brought from the BCC was contraband. The property inventory done by BCC staff while packing the boxes did not match the ACC defendants' property control sheet, indicating to plaintiff that some of his property was missing, including 300 sermon tapes and several books. Of all the property in all his boxes, the equivalent of one box's contents was deemed contraband. Plaintiff wanted to grieve all of his property complaints, but property officers lied and told him he had to grieve each piece of property separately.

Plaintiff alleges that defendants Workman, Griffin, and Strickland, who are supervised by

2

Lt. Perry, removed several items as contraband. Staff confiscated ten[1] of twelve religious books because the books had someone else's name in them. Plaintiff wrote "B. Hawkins" and his inmate number in the books and informed ACC property control, mail room, and inmate records staff upon his arrival that he had previously legally changed his name from Daughton Lacey, Jr. to BaruchYah Hawkins. Plaintiff argues that the books' seizure "substantially burdened [his] ability to practice his religion, as some of the books were explanatory in nature of his belief system, and the custom, manner, and practice of his beliefs."

Plaintiff went to the ACC Property Department on October 2, 2009, where he was told that half of the items in his "hot box" were contraband because they were altered, used, or unauthorized at the ACC. Officials confiscated his sneakers and issued him hard-soled shoes. Plaintiff complains that ACC staff seized his sneakers because the inside heels of both shoes were worn down and he could allegedly hide contraband inside the shoes. Plaintiff could not enter the ACC gymnasium with his hard-soled shoes and needed to purchase sneakers from the ACC commissary. However, the sneakers he was told to buy were the same sneakers confiscated, which happen to be the same style shoe most of the ACC inmates also wore. ACC staff also confiscated the cable-TV transformer, which plaintiff purchased from a previous commissary, because it was allegedly unauthorized, but plaintiff alleges that it was authorized. ACC staff also confiscated his Book of Yahweh as altered because the BCC chaplain's office

---

[1] Plaintiff states he received The Book of Yisrayl and The Second Book of Yisrayl. (Pl.'s Resp. (no. 30) ¶ 18.) Plaintiff explains that the books were "explanatory in nature of his belief system, and the custom, manner, and practice of his beliefs." (Compl. ¶ 50.) Plaintiff acknowledges that, besides his Book of Yahweh, prison staff officially confiscated three religious books, but he alleges that staff confiscated seven more books but did not list them on the confiscation sheet to prevent him from grieving their confiscation. (Pl.'s Supplemental Resp. (no. 32-2) ¶ 6.)

used clear tape to repair its broken binding. Defendant Workman told plaintiff he could not remedy the contraband by removing the clear tape because it would still be altered by its damaged condition. Plaintiff also did not receive his Tallit prayer shawl because it was too large and appeared "homemade." ACC staff also seized two board games because they were not allowed in the ACC although VDOC Department Operating Procedure ("DOP") 802.1 specifically permits inmates to possess two board games. ACC staff also seized his cassette player because the tape door broke during the transfer. Without an operable cassette player, plaintiff's religious sermon tapes were considered contraband.

ACC staff told plaintiff that VDOC policy permits him to either pay to mail the contraband to someone or have someone come to the ACC and recover the property. On November 9, 2009, staff told plaintiff he had to pay to ship his contraband out of the ACC or that the items would be converted to VDOC property and be disposed. Plaintiff wanted to make all his contraband available for family to make only one trip to the ACC to pick-up the property, but staff told plaintiff that he could only ship the materials out. However, plaintiff did not have enough money to mail them, and staff declined to pay for their shipping. Plaintiff concludes that he has not been able to pray or practice his religion since arriving at the ACC. Plaintiff alleges that the ACC staff who marked his Book of Yahweh as contraband violated his First Amendment right to the free exercise of religion.

As of December 2009, plaintiff was employed as an inmate law clerk in the ACC law library, where inmates are allowed to use computers to type their legal work. Plaintiff alleges that inmate law clerks are allowed to do their legal work on the computers, too. Plaintiff instituted a federal civil action in December 2009 to prevent ACC staff from converting his

4

property considered contraband into state property. After this action was dismissed, plaintiff created and tried to print a "Motion for a Writ of Prohibition" ("Motion") on December 11, 2009, that he intended to file to prevent ACC staff from converting a religious publication. On December 15, 2009, defendant Bird told plaintiff that defendant Lawhorn seized his Motion and removed its exhibit, an alleged eighteen page religious document. After consulting with Lawhorn, Bird intended to terminate plaintiff's prison job for typing it on a law library computer.

On December 22, 2009, plaintiff, defendant Canterbury, and two other staff attended plaintiff's institutional hearing to terminate him as an inmate law clerk. Plaintiff alleges he did not receive notice of the hearing, did not have time to prepare, could not call witnesses, and did not receive a copy of the results for nine days, all allegedly in violation of VDOC policies. Plaintiff was not allowed to appeal his termination and never received a response to his grievances. Plaintiff argues that Lawhorn's interference with his Motion delayed him from filing this action, paying for it, or receiving copies. Plaintiff also complains that ACC staff can see his legal arguments before he files them with a court.

Plaintiff alleges that defendants Hollar, Braxton, and Garman reviewed his grievances about the seized property but did not remedy his complaints. Therefore, plaintiff concludes that they aided and abetted in violating his rights. Plaintiff sent a letter and a draft of the facts stated in this civil action to defendant Jabe, complaining that ACC staff violated his rights to religious practice, but Jabe never responded.

In January 2010, plaintiff requested permission from the ACC Chaplain and Treatment Department to receive unleavened bread ("Matza") trays during Passover and the eight-day Feast of Unleavened Bread. Lawhorn denied the request because plaintiff had not yet been authorized

to receive Matza trays but told him that he could request authorization from the VDOC Faith Review Committee. Plaintiff filed his request with the Faith Review Committee, but reiterated to Lawhorn that he was a Yahwist. Lawhorn told him that she thought plaintiff practiced Buddhism, whose adherents would not be pre-approved to receive Matza trays. Plaintiff acknowledges that Lawhorn subsequently recognized that plaintiff was a Yahwist and he received his requested Matza trays.[2]

As a result of these events, plaintiff generally alleges that the defendants violated his rights and prevented him from practicing his religion by confiscating his Book of Yawheh, Tallit, and religious books ("religious property") (Claims 16, 17, and 31). More specifically, plaintiff alleges 28 claims[3] for relief, which are summarized as follows:

1. Correctional Officers Perry, Workman, Griffin, and Strickler violated plaintiff's First Amendment and RLUIPA religious rights by applying VDOC policy to confiscate his Book of Yawheh, Tallit, and religious books, which allegedly denied him his ability to pray (Claims 1, 2, 3, 4, 5, 11, and 13);

2. Lawhorn violated plaintiff's First Amendment right to the free exercise of religion (Claim 18);

3. Correctional Officers Perry, Workman, Griffin, and Strickler violated the

---

[2] Plaintiff acknowledges that the facts involving his Matza trays are not the basis of an independent claim but are included to show the extent to which defendants try to persecute plaintiff. (Pl's Resp. (no. 30) ¶ 38(a).)

[3] Plaintiff acknowledges in his complaint that he is suing for only the seizures of his religious property and is not pursuing relief in this action for the non-religious items, like the board games, TV adapter, tape player, cassettes, or sneakers. (Compl. 15 n.6.) Plaintiff says he included the facts about the non-religious items to show the defendants' "arbitrary and capricious nature of the defendants' application and abuse of [VDOC] policy. . . ." (Id.) Plaintiff also does not present as a claim a facial challenge to DOP 802.1 under RLUIPA. Although I liberally construe pro se complaints, Haines v. Kerner, 404 U.S. 519, 520-21 (1972), I do not act as the inmate's advocate, sua sponte developing statutory and constitutional claims the inmate failed to clearly raise on the face of the complaint. See Brock v. Carroll, 107 F.3d 241, 243 (4th Cir. 1997) (Luttig, J., concurring); Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985). See also Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978) (recognizing that district courts are not expected to assume the role of advocate for the pro se plaintiff). Even if he did facially challenge the policy, it would fail because the policy does not substantially burden sincerely held religious beliefs on its face, addresses compelling governmental interests, and provides the least restrictive means to satisfy those interests by its exceptions and provisions.

Fourteenth Amendment's due process clause and VDOC policies by seizing and disposing of plaintiff's religious property (Claims 10, 12, 14, and 15);

4.  Hollar, Braxton, Garman, and Jabe violated plaintiff's First Amendment and RLUIPA rights by upholding subordinates' violations via the grievance process (Claims 6, 7, 8, 9, 26, 27, 28, and 29);

5.  Lawhorn violated plaintiff's First Amendment right to free speech, petition the government, and reasonable access to courts (Claims 19, 20, 21, 23, and 24);

6.  Lawhorn retaliated against plaintiff for filing a civil action in federal court (Claim 22); and

7.  Cantebury violated the Fourteenth Amendment's due process clause during the hearing to determine whether plaintiff should stay employed in the law library and that Bird violated plaintiff's constitutional rights when she fired plaintiff from his inmate law-library job (Claims 25 and 30).

Plaintiff requests declaratory, injunctive, and legal relief. Plaintiff asks the court to declare that the defendants, either by their overt acts or policies, violated plaintiff's constitutional rights. Plaintiff requests permanent injunctions to invalidate DOP 802.1; prevent defendants from working in any property department in any prison unless they are trained about the policy that would replace DOP 802.1; and prevent Lawhorn from working in any prison. Plaintiff requests compensatory damages of $20,000 plus $1,000,000 for each day he cannot practice his religion and punitive damages of $20,000,000 from the defendants and $5,000 from Lawhorn. Plaintiff alleges as the basis of his RLUIPA claims that the VDOC receives federal funding. (Compl. ¶ 14.)

B.  DEPARTMENT OPERATING PROCEDURE 802.1

DOP 802.1 ("Offender Property") guides prison officials in the organization and disposition of inmates' property within VDOC facilities. Property may be confiscated because it is contraband; stolen; loaned, traded, sold, or gifted to another inmate; excessive, unauthorized,

or unwanted; or altered or modified without written authorization. DOP 802.1(VII)(E), (G). Contraband is defined as "an item forbidden for entry, possession, or removal from a [VDOC] facility" or "[a]n item in the possession of, or accessible to, an offender that has not been specifically issued to, or authorized for possession by the offender[] or has not been obtained by the offender in accordance with operating procedures." Id. (III). Contraband can include "[s]tate or personal property of any type not specifically authorized for possession or use by an offender" or "[s]tate or personal property, regardless of how acquired, that is inoperable or has been modified or altered without written permission[.]" Id. Inmates may not loan, trade, sell, or gift any personal property to each other. Id. (IV)(J)(5). The policy also recognizes that some "hobby" and "craft" property may not be allowed at all facilities. Id. (IV)(C)(3).

Property that arrives with an inmate at initial intake into the VDOC but is determined to be "disallowed" may be set aside for visitor pick-up or mailed to an address at the VDOC's expense. However, the VDOC pays for this service only upon initial intake into the VDOC. Id. (IV)(G)(6). Property received after initial intake that is later deemed disallowed would be mailed at only the inmate's expense. Id. (VII)(D)(1). "An offender transferred to a facility that does not permit an item otherwise authorized under this procedure must arrange for disposition of the item as provided" by the policy. Id. (IV)(C)(4).

When an inmate is transferred from one VDOC facility to another, an officer searches and inventories the inmate's personal property and completes a form with a copy each for the officer, for the inmate's file, and in the boxed contents. DOP 802.1 (F)(1). The sending facility should seize any contraband before shipping the property to the receiving facility.

The receiving facility's staff may also determine whether received property is contraband

and may seize it. Id. (V)(F)(5)(g). When an inmate arrives at the new facility with property that

is disallowed at the new facility, the inmate is given the opportunity to dispose of the property by

permitting a visitor to pick it up or mailing it at the inmate's expense. Id. (V)(F)(5)(f). Property

subject to visitor pick-up is held for up to thirty days. Id. (VII)(D)(2). Property not disposed by

either method is subject to administrative confiscation. Id. (V)(F)(5)(f). Disallowed property is

not converted into state property until all appeals about the confiscation are exhausted. Id.

(VII)(E). An inmate may administratively appeal the decision to confiscate property. An appeal

resolution would compel state conversion or returning the property to the inmate to keep, to mail

out of the facility, or permit a visitor to pick it up. Id. (VII)(I).

C.      ADMINISTRATIVE REMEDIES

        DOP 866.1, Inmate Grievance Procedure, is a mechanism for inmates to resolve

complaints, appeal administrative decisions, and challenge the substance of procedures. The

process provides correctional administrators a means to identify potential problems and, if

necessary, correct those problems in a timely manner. All issues are grievable except issues

about policies, procedures and decisions of the Virginia Parole Board; disciplinary hearing

penalties and/or procedural errors; state and federal court decisions, laws and regulations; and

other matters beyond the VDOC's control.

        Inmates are oriented to the inmate Grievance Procedure when they are received into the

VDOC. Prior to submitting a grievance, the inmate must demonstrate that he has made a good

faith effort to informally resolve his complaint by submitting an informal complaint form

available in their housing unit. If not resolved, the inmate must file a regular grievance within

thirty calendar days from the date of occurrence or incident. Only one issue per grievance will be

addressed. Regular grievances may receive three levels of review. A facility's warden or superintendent conducts the first, "Level I" review of the grievance. If the inmate is dissatisfied with the determination, he may appeal the determination to Level II, which is done by the Regional Ombudsman/Director. For most issues, Level II is the final level of review. For the few issues appealable to Level III, the Deputy Director or Director of the VDOC conducts the final review of the regular grievance.

II.

A.    PLAINTIFF'S TRANSFER MOOTS HIS REQUEST FOR INJUNCTIVE AND DECLARATORY RELIEF.

Plaintiff may neither receive declaratory nor injunctive relief for claims based on events or policies within the ACC. During the pendency of this action, plaintiff was transferred from the ACC to another VDOC facility. "Transfer of an inmate from a unit or location where he is subject to the challenged policy, practice, or condition, to a different unit or location where he is no longer subject to the challenged policy, practice, or condition moots his claims for injunctive and declaratory relief, even if a claim for money damages survives." Uncumaa v. Ozmint, 507 F.3d 281, 286-87 (4th Cir. 2007) (collecting cases to support dismissal of injunctive and declaratory remedies as moot upon prisoner's transfer from facility of challenged action).

Plaintiff is no longer subject to the staff or conditions at the ACC or the ACC staff's interpretation of VDOC policies. Because plaintiff is no longer housed at the ACC, any declaratory or injunctive relief in his favor would not have a real impact on his rights or address the injuries he asserts from the conditions or the ways VDOC policies were applied at the ACC. Therefore, plaintiff's requests for declaratory and injunctive relief as to the ACC are moot. Plaintiff may not recover money from these defendants via a RLUIPA claim, Sossamon v. Texas,

10

131 S. Ct. 1651, 1663 (2011), and injunctive and declaratory relief for how ACC staff handled

property in violation of RLUIPA is moot. Accordingly, plaintiff cannot proceed with his

RLUIPA claims about how DOP 802.1 was applied at the ACC.

However, plaintiff remains within the VDOC and is subject to DOP 802.1. Because

plaintiff requested damages for his constitutional claims, the action is also not mooted. Covenant

Media of S.C., LLC v. City of N. Charleston, 493 F.3d 421, 429 n.4 (4th Cir. 2007) (even if a

plaintiff's injunctive relief claim has been mooted, the action is not moot if the plaintiff may be

"entitled to at least nominal damages.").

B.    PLAINTIFF MAY NOT MOVE TO STRIKE DEFENDANTS' MOTION AND AFFIDAVITS.

Plaintiff filed a motion to strike the defendants' motion for summary judgment and

averments made in support of it because he believes the defendants committed perjury, and he

moves the court for sanctions. A court may strike "from a pleading an insufficient defense or any

redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). See Zinaman

v. USTS N.Y.S., Inc., 798 F. Supp. 128, 135 (S.D.N.Y. 1992) (noting that "[m]otions to strike

are generally disfavored"); Hanley v Volpe, 305 F. Supp. 977, 980 (E.D. Wis. 1977) ("Any doubt

as to striking of matter in pleading should be resolved in favor of pleading."). However, the

documents plaintiff wants stricken are not "pleadings." See Fed. R. Civ. P. 7(a) (defining

pleadings as a complaint; an answer to a complaint; an answer to a counterclaim designated as a

counterclaim; an answer to a crossclaim; a third-party complaint; an answer to a third-party

complaint; and, if by court order, a reply to an answer). See also Lowery v. Hoffman, 188 F.R.D.

651, 653 (M.D. Ala. 1999) ("Motions, briefs or memoranda, objections, or affidavits may not be

attacked by the motion to strike.") (citing 2 James Wm. Moore, et al., Moore's Federal Practice

§12.37 [2] (3d ed. 1999); Weiss v. PPG Indus., Inc., 148 F.R.D. 289, 292 (M.D. Fla. Apr. 13, 1993) ("A motion is not a pleading, and thus a motion to strike a motion is not proper under [Rule] 12(f)."). Accordingly, I deny plaintiff's motion to strike, and since credibility decisions are not dispositive upon defendants' motion for summary judgment, I decline to determine whether defendants' committed perjury and deny plaintiff's motion for sanctions. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 404 (1990) ("[T]he district court is best acquainted with the local bar's litigation practices and thus best situated to determine when a sanction is warranted to serve Rule 11's goals.") (superseded in part by Fed. R. Civ. P. 11(c)(1) "safe harbor" amendment); Corley v. Rosewood Care Ctr., Inc., 388 F.3d 990, 1013 (7th Cir. 2004) ("[D]ecisions concerning Rule 11 sanctions are better left to the discretion of the district court which has a bird's eye view of the actual positions taken by the litigants").

C.    SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[3] Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of

---

[3] The parties received reasonable and explicit notice that the court may convert a motion to dismiss that references matters outside the pleadings into a motion for summary judgment when the Clerk issued a timely Roseboro notice. See Fed. R. Civ. P. 12(d); Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975).

evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts admissible as evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); id. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991). A court may neither resolve disputed facts or weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility, Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). Furthermore, a party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v.

Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995). Moreover, a plaintiff

cannot rely on a response to a motion for summary judgment to act as an amendment to correct

deficiencies in a complaint challenged by a defendant's motion for summary judgment. See

Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not

amend her complaint through argument in a brief opposing summary judgment."); Barclay White

Skanska, Inc. v. Battelle Mem'l Inst., 262 F. App'x 556, 563 & n.16 (4th Cir. 2008) (No. 07-

1084), available at 2008 WL 238562, at *6, 2008 U.S. App. LEXIS 1916, at *18-20 (noting that

other circuits similarly prohibit a plaintiff from raising new claims in opposition to summary

judgment and noting that district courts within the Fourth Circuit have adopted Gilmour).

D.    ADMINISTRATIVE EXHAUSTION

        The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust all available

administrative remedies before bringing a claim under 42 U.S.C. § 1983.  42 U.S.C. § 1997e(a).

See Woodford v. Ngo, 548 U.S. 81, 85 (2006) (stating that "[e]xhaustion is no longer left to the

discretion of the district court, but is mandatory"); Porter v. Nussle, 534 U.S. 516, 532 (2002)

(stating that the PLRA applies to "all inmate suits, whether they involve general circumstances or

particular episodes, and whether they allege excessive force or some other wrong"); Booth v.

Churner, 532 U.S. 731, 739 (2001) (finding that the PLRA requires administrative exhaustion

prior to the filing of a federal civil rights suit even if the form of relief the inmate seeks is not

available through exhaustion of administrative remedies).  Pursuant to the PLRA, prisoners must

not just initiate timely grievances, but must also timely appeal through all levels of available

administrative review any denial of relief. Woodford, 548 U.S. at 93 (holding that the PLRA

requires "proper exhaustion" of institutional administrative remedies before filing any federal

14

suit challenging prison conditions). To properly exhaust a claim, an inmate must file grievances with sufficient detail to alert prison officials of the possible constitutional claims which are now alleged as a basis for relief. See Smith v. Rodriguez, No. 7:06-cv-00521, 2007 U.S. Dist. LEXIS 43571, 2007 WL 1768705 (W.D. Va. June 15, 2007) (citing McGee v. Fed. Bureau of Prisons, 118 F. App'x 471, 476 (10th Cir. 2004)). Failure to exhaust is an affirmative defense that defendant has the burden of pleading and proving. Anderson v. XYZ Corr. Health Servs., Inc., 407 F.3d 674, 681 (4th Cir. 2005).

The defendants allege plaintiff failed to exhaust administrative remedies about the Tallit. However, plaintiff filed a copy of Garman's Level II response discussing plaintiff's appeal of the Tallit's confiscation, which states that Level II was the last level of review for that issue. (Pl.'s Resp (no. 30) Encl. A-3.) Accordingly, the record does not support defendants' argument, and they are not entitled to summary judgment about unexhausted administrative remedies for the Tallit claim.

E.    QUALIFIED IMMUNITY FROM DAMAGES

Plaintiff names the defendants in their personal capacities,[4] and the defendants assert the defense of qualified immunity. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is an immunity from suit rather than a mere defense to liability. Thus,

---

[4] To the extent plaintiff sues the defendants in their official capacities for damages, neither a state nor its officials acting in their official capacities are persons for purposes of § 1983 damages actions and are entitled to sovereign immunity. Sossamon, 131 S. Ct. at 1663; Will v. Michigan Dep't of State Police, 491 U.S. 58, 70-71, n.10 (1989).

whether a defendant can claim qualified immunity is a pure question of law and is properly

determined pretrial. Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (modified by Pearson v.

Callahan, 129 S. Ct. 808 (Jan. 21, 2009) (permitting lower courts the discretion to determine

which qualified immunity prong to analyze first)). A plaintiff bears the burden to show that a

defendant's conduct violated the plaintiff's right. Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir.

1993). However, a defendant must demonstrate that the right was not clearly established at the

time of the incident to receive qualified immunity. Henry v. Purnell, 501 F.3d 374, 378 (4th Cir.

2007). "The unlawfulness of the action must be apparent when assessed from the perspective of

an objectively reasonable official charged with knowledge of established law." Lopez v.

Robinson, 914 F.2d 486, 489 (4th Cir. 1990). See Anderson v. Creighton, 483 U.S. 635, 640

(1987) ("This is not to say that an official action is protected by qualified immunity unless the

very action in question has previously been held unlawful . . . but it is to say that in the light of

pre-existing law the unlawfulness must be apparent."). After reviewing plaintiff's allegations, I

find that plaintiff fails to show that a defendant violated one of plaintiff's rights. Accordingly,

the defendants are entitled to qualified immunity from damages in their individual capacities.

    1.    Legal Standard for First Amendment Claims

Inmates "clearly retain protections afforded by the First Amendment, including its

directive that no law shall prohibit the free exercise of religion." O'Lone v. Estate of Shabazz,

482 U.S. 342, 348 (1987). However, inmates' First Amendment rights must be balanced with

prisons' institutional needs of security, discipline, and general administration. Id. at 349. Thus,

"a prison regulation that abridges inmates' constitutional rights is 'valid if it is reasonably related

to legitimate penological interests.'" Lovelace v. Lee, 472 F.3d 174, 199 (4th Cir. 2006) (citing

Turner v. Safley, 482 U.S. 78, 84 (1987)).  Whether a regulation is reasonably related depends on:

> (1) [W]hether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right … remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns.

Id. at 200 (citing Turner, 482 U.S. at 89-92).  The prisoner has the burden of proof to disprove the validity of a prison regulation pursuant to the Turner analysis.  Overton v. Bazzetta, 539 U.S. 126, 132 (2003).

> a.  Plaintiff fails to show that Correctional Officers Perry, Workman, Griffin, and Strickler violated plaintiff's religious rights by applying VDOC policy to confiscate his Bible, Tallit, and religious books, which allegedly denied him his ability to pray.[5]

DOP 802.1 is reasonably related to VDOC's legitimate penological interest to maintain institutional security.  Plaintiff was not permitted to keep the Tallit because staff deemed it "homemade" and "large enough to cover a twin bed . . . which makes it a security concern." (Def.s' Br. Supp. Mot. Summ. J. Encl. B.)  The large shawl would easily hide contraband from sight if laid on the bed, either crumpled up or folded, and would make it more dangerous for correctional staff to approach plaintiff.  The policy also permits ACC staff to prohibit a crafted,

---

[5] As previously discussed, plaintiff's RLUIPA claim challenging how Perry, Workman, Griffin, and Strickler applied policy is mooted by his transfer, and he cannot recover damages under RLUIPA.  Plaintiff's requests for damages under the First Amendment remain, however.

17

"homemade" shawl.[6] The Book of Yahweh was altered from its original form because the binding detached and had been reattached with clear tape. An inmate's ability to hide contraband within the broken binding and cover, not underneath the clear tape as plaintiff suggests, is a valid security concern. If allowed in an altered state, staff would have to vigorously inspect the book's cover and binding to search for contraband, possibly damaging the property, instead of a visual search of an unaltered book from an approved vendor. Plaintiff would also be at risk of another inmate placing contraband inside the broken parts of the book without his knowledge. Although plaintiff argues in part that staff seized the Book of Yahweh because it had clear tape on the binding, the administrative record reveals that it was seized because of its dilapidated condition. Furthermore, the policy permits altered property with written permission, but plaintiff failed to describe any attempt to have his altered Book of Yawheh be excepted from the general policy.

Staff confiscated ten of his twelve religious books because plaintiff had written his legal, religious name inside them instead of his birth, VDOC name. DOP 802.1 prohibits inmates from receiving another inmate's property to prevent conflict over thefts, swindling, or more mundane property disputes that have the potential to cause an escalating threat to security and discipline.

Furthermore, plaintiff was not deprived of all forms of his religious exercise because plaintiff retained two of his twelve religious books and had permission from Warden Braxton to obtain a new and unaltered Book of Yahweh. Plaintiff was also not barred from purchasing religious items from approved vendors or praying by himself or another Yahwist inmate. The policy's remedy to permit plaintiff to mail confiscated property or allow someone to recover the property is the best alternative than to confiscate and convert it into state property, and the policy

---

[6] Plaintiff describes the Tallit as looking crocheted but having a manufacturer's tag.

is not an exaggerated response.

To the extent plaintiff complains that unspecified prison officials did not provide him

with another Book of Yawheh, Tallit, or religious books, plaintiff fails to state a constitutional

claim. "There cannot possibly be any constitutional or legal requirement that the government

provide materials for every religion and sect practiced in this diverse country. At most,

[religious] materials cannot be denied to prisoners if someone offers to supply them." Cruz v.

Beto, 405 U.S. 319, 323 (1972) (Burger, C.J., concurring). State officials are not affirmatively

required by the Constitution or RLUIPA to assist plaintiff in his spiritual journey. See Florer v.

Congregation Pidyon Shevuyim, N.A., 639 F.3d 916, 923-24 (9th Cir. 2011).

> b.   Plaintiff fails to show that Lawhorn violated plaintiff's First Amendment right to
>      the free exercise of religion.

Plaintiff fails to describe in his complaint any constitutional claim about the free exercise

of religion against Lawhorn. The only possible allegation involves the confusion whether

plaintiff could receive Matza trays. However, plaintiff concedes that he is not pursuing a claim

involving the Matza trays but only included the facts as background information. (Compl. ¶ 100;

Pl.'s Resp. ¶ 38.) Accordingly, plaintiff fails to state a claim against Lawhorn for a First

Amendment free exercise of religion claim.

> c.   Plaintiff fails to show that Correctional Officers Perry, Workman, Griffin, and
>      Strickler violated due process and VDOC policies by seizing and disposing of
>      plaintiff's religious property.

Correctional Officers Perry, Workman, Griffin, and Strickler did not violate due process

by seizing and disposing of plaintiff's religious property. The deprivation of property may

implicate constitutional rights if the deprivation is accomplished without providing the property

owner due process of law. Parratt v. Taylor, 451 U.S. 527, 537 (1981). See also Carey v. Piphus, 435 U.S. 247, 259 (1977) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of . . . property"). To determine whether a constitutional violation has occurred, a court must determine what procedural protection the state has provided in conjunction with the policy and whether those procedures were sufficient to ensure that deprivations pursuant to the policy are lawful. Zinermon v. Burch, 494 U.S. 113, 126 (1990). When the deprivation is made pursuant to some official policy, the inmate must be afforded some combination of predeprivation notice and a chance to be heard. Id. The property owner should have a chance to be heard before he is deprived of the property whenever such a procedure is feasible. Id. Pursuant to DOP 802.1, "[a] facility may seize, and should retain custody of, the property until a determination regarding confiscation has been made[,]" and"[t]he offender should be given notification of the confiscation and the right to appeal before the property is permanently confiscated." Under the established policy, inmate property may be confiscated if, among other reasons, "[t]he property is contraband." In this case, plaintiff's items were confiscated as contraband, and the VDOC's policy of providing a confiscation notice and an opportunity to challenge the confiscation is sufficient to satisfy plaintiff's due process right in this case.

To the extent plaintiff argues that the officers did not follow VDOC policy when confiscating his property, his claim does not rise to the level of a constitutional violation. The intentional or negligent deprivation of personal property by a prison employee acting outside the scope of official policy or custom does not rise to the level of a constitutional violation so long as the state provides an adequate post-deprivation remedy. See Hudson v. Palmer, 468 U.S. 517

(1984); Parratt v. Taylor, 451 U.S. 527 (1981).

Plaintiff used the VDOC's grievance procedures to appeal the confiscation. Furthermore, the Virginia Tort Claims Act is also available to plaintiff.[7] See Wadhams v. Procunier, 772 F.2d 75 (4th Cir. 1985) (holding the remedies available under the Virginia Tort Claims Act to be sufficient post-deprivation remedies); Ballance v. Young, 130 F. Supp. 2d 762, 767 (W.D. Va. 2000). Moreover, a claim that prison officials have not followed their own policies or procedures also does not state a constitutional claim. See United States v. Caceres, 440 U.S. 741, 752-55 (1978); Riccio v. Cnty. of Fairfax, Va., 907 F.2d 1459, 1469 (4th Cir. 1990) (holding that if state law grants more procedural rights than the Constitution requires, a state's failure to abide by that law is not a federal due process issue). Accordingly, plaintiff fails to state a cognizable constitutional claim that the defendants intentionally or negligently deprived him of his personal property in violation of due process because there are state remedies capable of addressing plaintiff's alleged injury.

      d.      Plaintiff fails to show that Hollar, Braxton, Garman, and Jabe violated plaintiff's First Amendment and RLUIPA rights by upholding subordinates' violations via the grievance process.

As previously discussed, plaintiff's RLUIPA claim challenging how Braxton and Hollar applied policy is mooted by his transfer, and he cannot recover damages under RLUIPA. Because plaintiff failed to establish a constitutional deprivation concerning the confiscation of his religious property or ability to practice his religion, plaintiff logically fails to establish that the grievance reviews that upheld staff's actions violated his constitutional rights. See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (supervisory liability requires, inter alia, knowledge that

_____

[7]Plaintiff states he is already seeking relief in state court pursuant to the Virginia Tort Claims Act.

a subordinate created a pervasive and unreasonable risk of constitutional injury and an affirmative causal link between the supervisor's inaction and the plaintiff's constitutional injury).

     e.     Plaintiff fails to show that Lawhorn violated plaintiff's First Amendment right to free speech, petition the government, and reasonable access to courts.

Plaintiff argues that Lawhorn violated his First Amendment rights to free speech, to petition the government, and reasonable access to courts when she confiscated his Motion in the law library in December 2009. Plaintiff argues that the Motion would be "crucial" to this action.

A court reviews "an alleged violation of the petition clause in the same manner as any other alleged violation of the right to engage in free speech." Gray v. Lacke, 885 F.2d 399, 412 (7th Cir. 1989). The Turner analysis applies to a prisoner's claim that an official acting pursuant to policy violated his First Amendment right to free speech. For this claim, the policy that inmate law library clerks may not use the law library computers to type documents other than legal work is reasonably related to legitimate penological interests. Prison officials must ration the scare law library resources among many inmates, and inmates may draft documents for personal or legal purposes either by hand or by writing resources outside the law library.

Inmates have a constitutional right to reasonable access to courts to challenge their convictions or vindicate their constitutional rights. See Bounds v. Smith, 430 U.S. 817, 838 (1977). However, "Bounds did not create an abstract, freestanding right to a law library or legal assistance"; these options are means for ensuring "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." Lewis v. Casey, 518 U.S. 343, 351 (1996) (quoting Bounds, 430 at 825). Thus, Bounds does not require a particular method to ensure reasonable access to courts but requires only a state-provided capability to

bring an action related to a criminal appeal, collateral attack, or civil rights violation. Id. at 356.

The right of reasonable access to courts "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." Christopher v. Harbury, 536 U.S. 403, 415 (2002). Thus, a plaintiff must also "state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued." Christopher, 536 U.S. at 417 (internal footnote omitted). "[T]he predicate claim [must] be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." Id. at 416. Accordingly, in order to plead a backward looking denial of reasonable access to courts claim, a plaintiff must identify with specificity a non-frivolous legal claim that a defendant's actions prevented him from litigating. Christopher, 536 U.S. at 415-16; Lewis, 518 U.S. at 353 n.3. This requirement means the "inmate must come forward with something more than vague and conclusory allegations of inconvenience or delay in his instigation or prosecution of legal actions. . . . The fact that an inmate may not be able to litigate in exactly the manner he desires is not sufficient to demonstrate the actual injury element of an access to courts claim." Godfrey v. Washington Cnty., Va., Sheriff, No. 7:06-cv-00187, 2007 U.S. Dist. LEXIS 60519, at *39, 2007 WL 2405728, at *13 (W.D. Va. Aug. 17, 2007) (citing Lewis, 518 U.S. at 351).

Lawhorn did not violate plaintiff's right to reasonable access to courts by confiscating the Motion. Plaintiff fails to elaborate how she "prohibited" plaintiff from filing this action, to

which the Motion is allegedly crucial, or how he was prejudiced.[8] Plaintiff even acknowledges

that Lawhorn's actions, at most, "delayed (yet not totally prevented) plaintiff's ability to pursue

this action." (Compl. ¶ 83.) Furthermore, plaintiff fails to show that success on his Motion

could be more than just a hope or that the Motion could overcome the nonfrivolous test, as

evidenced by his earlier attempt to have me interfere with prison administration. See Lacey v.

Braxton, et al., No. 7:09-cv-00476 (W.D. Va. Dec. 7, 2009) (dismissing Lacey's Petition for an

Extraordinary Writ that sought an order preventing prison officials from taking his personal

property). Moreover, plaintiff does not need to be an inmate law clerk in order to access writing

instruments or file legal documents.

      f.      Plaintiff fails to show that Lawhorn unconstitutionally retaliated against him for filing a civil action in federal court.

Claims of retaliation by prison inmates are generally treated with skepticism because

"[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it

responds to prisoner misconduct." Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996);

Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994). To prevail on a claim of retaliation, an inmate

must demonstrate that he engaged in protected conduct and that his protected conduct motivated

the retaliatory act. See Huang v. Bd. of Governors of Univ. of N.C., 902 F.2d 1134, 1140 (4th

---

[8]      Petitioner included a copy of the Motion in his response to the defendants' motion for summary judgment. The fact petitioner had access to a copy of the seized document does not support an inference of prejudice. Furthermore, the document was not "crucial" to this action as plaintiff intended to use it only in support of his accusation that prison officials generally arbitrarily and capriciously violate VDOC policy.

      The "crucial" document he sought to recover as an attachment to the Motion was a Spring 2004 newsletter from BCC that he and other inmates made under the guidance of a chaplain. The Winter 2004 newsletter reused the same articles from the Spring 2004 newsletter but contained different artwork and different poems. However, ACC staff allowed the possession of the Spring 2004 newsletter but disallowed the Winter 2004 newsletter, which had different artwork and different poems. Plaintiff acknowledges that he was creating the eighteen-page exhibit as a "near facsimile" of the original, thirty-page document, and the file-path of the exhibit reveals that it was stored in plaintiff's directory called "bulletin board."

Cir. 1990).

Even if plaintiff's drafting of the exhibits was protected conduct, plaintiff fails to

establish a nexus between the confiscated documents and Lawhorn's motivation to retaliate.

Plaintiff fails to establish how Lawhorn knew of his first petition, <u>Lacey v. Braxton, et al.,</u> since

she was not a named defendant and the petition was never served on any VDOC staff. The first

petition was already dismissed by the time Lawhorn confiscated the exhibits, and plaintiff did not

have an action pending for which he could be retaliated against. Besides religious articles

plaintiff described as being in the Spring and Winter 2004 newsletters, the confiscated

documents also included an article critical of corrections systems unrelated to plaintiff's religion

or his Motion. In light of the record, plaintiff fails to establish an unconstitutional retaliation.

<u>See</u> <u>Atkinson v. Bohn</u>, 91 F.3d 1127, 1129 (8th Cir. 1996) (per curiam) (speculative and

conclusory allegations cannot support retaliation claim); <u>Wright v. Vitale</u>, No. 91-7539, 937 F.2d

604 (published in full-text format at 1991 U.S. App. LEXIS 15230, at *2, 1991 WL 127597 at *1

(4th Cir. July 16, 1991) (stating retaliation claim based on mere conclusory statements cannot

withstand defendants' summary judgment motion).

> g.   Plaintiff fails to show that Cantebury violated due process during the hearing to
>      determine whether plaintiff should stay employed in the law library (Claim 30)
>      and that Bird violated plaintiff's constitutional rights when she fired plaintiff from
>      his prison job.

The Due Process Clause of the Fourteenth Amendment mandates several procedural

safeguards before an inmate may be punished for violating prison disciplinary rules with the loss

of property or a protected liberty interest, such as earned good conduct time. <u>Wolff v.</u>

<u>McDonnell</u>, 418 U.S. 539, 557-58 (1974). These limited due process rights include advanced,

25

written notice of the charges, written findings, and a limited right to call witnesses. See id. at 563-64. However, plaintiff does not have a protected property interest in retaining his inmate law clerk job and, thus, was not entitled to Wolff's due process protections. See, e.g., Gibson v. McEvers, 631 F.2d 95, 98 (7th Cir. 1980). Because inmates have no independent constitutional right to a prison job, prison officials may generally terminate an inmate from his job for any reason without offending federal due process principles. Courts of Appeals consistently hold that an inmate's expectation of keeping a specific prison job, or any job, does not implicate a protected property interest. Bulger v. United States Bureau of Prisons, 65 F.3d 48, 50 (5th Cir. 1995). See, e.g., Coakley v. Murphy, 884 F.2d 1218, 1221 (9th Cir. 1989) (holding that inmates have no protected property interest in continuing in work-release program); Flittie v. Solem, 827 F.2d 276, 279 (8th Cir.1987) (opining that inmates have no constitutional right to be assigned to a particular job); Ingram v. Papalia, 804 F.2d 595, 596 (10th Cir. 1986) (concluding that the Constitution does not create a property interest in prison employment); Adams v. James, 784 F.2d 1077, 1079 (11th Cir. 1986) (stating that assignment to job as law clerk does not invest inmate with a property interest in continuation as such); Gibson v. McEvers, 631 F.2d 95, 98 (7th Cir. 1980) (holding that prisoner's expectation of keeping prison job does not amount to a property interest subject to due process protection); Bryan v. Werner, 516 F.2d 233, 240 (3d Cir.1975) (reasoning that inmate's expectation of keeping job is not a property interest subject to due process protection). Plaintiff's claims that Cantebury or Bird did not follow VDOC policies or procedures also does not state a constitutional claim. See United States v. Caceres, 440 U.S. 741, 752-55 (1978); Riccio v. Cnty. of Fairfax, Va., 907 F.2d 1459, 1469 (4th Cir. 1990) (holding that if state law grants more procedural rights than the Constitution requires, a state's

26

failure to abide by that law is not a federal due process issue).  Accordingly, plaintiff fails to establish that Cantebury violated due process or Bird unconstitutionally fired him from his prison job.

III.

For the foregoing reasons, I grant plaintiff's motion to file a supplemental response, deny plaintiff's motion to strike and motion for sanctions, and grant defendants' motion for summary judgment.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to plaintiff and counsel of record for the defendants.

**ENTER**: This __1st__ day of ~~July,~~ Aug. 2011.

Senior United States District Judge